No. 5-15-0123. Counsel Reza? Yes, Your Honor. Thank you. May I please sit down, Counsel? My name is Barbara Gobin. I represent Anthony G., the respondent in this appeal of an involuntary medication order. Basically, we have two issues, Your Honors. First of all is whether the state failed to prove by clear and convincing evidence that my client's behavior reached the criteria for involuntary medication. There's three criteria, threatening behavior, suffering, or deterioration of ability to function. The trial judge found threatening behavior and deterioration of functioning, and we'll argue later why the judge used too broad a category with those. And then the second issue is that the state failed to prove the value of the risk versus benefits because they failed to state the risk of all the proposed medications. With regard to the threatening behavior deterioration of ability to function issue, first of all, with regard to the debilitation of ability to function, it is basically this court in this case says you have to have a deterioration to a basic level. Initially, in my brief, I said if your health is at risk or if you're dangerous to yourself or others, since then, that would be which I've acknowledged in my reply, stated it has to be, didn't adopt that broad a standard, but said it has to be a basic level of deterioration. Basically, the main evidence that the state proved was that my client did not like to take showers once a week, and he had delusions. So basically, there's a clear case for all that delusions in and of themselves aren't sufficient for involuntary medication. And the second part is showering, they gave no explanation how this would affect him, endanger his health, or endanger the health of others, and he was willing to shower about once a week, so it wasn't, you know, horrible. I mean, you know, it's not good hygiene, but it's not sufficient enough for involuntary medication. The second part is, and I think this is the trickier area, to be honest, is the threatened behavior criteria. Basically, my client, I asked actually, we were all of you for threatened behavior that you have to be currently dangerous. I asked, actually, I took a leap during this hearing and asked the psychiatrist, is he currently dangerous? She responded, he's potentially dangerous. So... Do they consider past history of danger? Yeah, they do consider past history and current. They have to, they can consider past history, but they also have to consider current behavior, or else if you say commit one bad act in your life, then you would be medicated for the rest of your life. So that's why the statute requires, based on current behavior, though it allows, I think, for past behavior. This hearing occurred in March. In November and December, he was actually, had worse behavior. He actually hit people. In January, there was one incident. February, he was free of incidents. March, he had one incident that was, I would argue, more disruptive. Which one was that in March? It was March 2nd. He actually tapped a staff worker in the back, and she told him not to. He threw some food down, and he also wound the nurse's station. So... And then what was the hearing? And the hearing was at the end of March. So there was testimony... Isn't that, you don't, do not consider that current? Well, the two weeks prior, according to the observations of staff, he had no threatening or disruptive behavior during the immediate two weeks prior to the hearing. And I would also say that his behavior during that one time was more disruptive, which the legislature, in 2000, they amended the code to, it used to be for disruptive behavior. You could involuntary medicate someone. They struck out disruptive and put threatening behavior. And I would say what he, what they did was more for patient management issues to get him more compliant with showering, to get him, you know, not mean at them or not throw the food, you know. I don't think it's to the level of threatening behavior that he was dangerous to himself or others. You're talking about which...  You're just talking about the latest one in March. In March, yeah. So the chronology then would be that the petitions filed when? Well, the petition was filed in mid-March. So, I mean, it could only be current as of that date, right? Right, yeah. And that was about when it happened? No, it was about two to three weeks before when it, before the hearing date. So what I'm saying, you're saying before the hearing date, but when did they file the petition? They don't have the hearing the same day, I mean. Yeah, they filed it, let me look, I'm sorry. Here, let me see. That's okay. That wasn't very clear. Yeah, they filed it on March 11th. Uh-huh. And the wedge incident with the moon was on, they actually, March the 2nd. So it was about a week. And then the hearing, though, was in March 26th, so. But they would only be considering issues that were alleged during the petition, when the petition was? Well, and after, to be honest with you. If someone is ill after they file a petition, and there's like a couple weeks in between, the judge will hear more current information. Okay. So we're saying that his, even if he admits it March 2nd, that's really not the level of threatening behavior to warrant involuntary medication. We would say that's more of a level of disruptive behavior, because basically he just tapped a co-worker and wound people and threw a tray. You know, I think it's more in the nature of he was more frustrated at the hospital than being dangerous. And I understand patients and other staff history, they would actually have had a stronger case if they would have filed it in December or January when he actually struck people. But he didn't do it at that time. And there was direct testimony from his record that there was no verbal or physical aggression through his weekly reports of the last two weeks or unusual behaviors before the hearing. And he was coloring, interacting with peers, watching television, you know, so there was evidence that he was pretty calmed down after that March incident. So we would argue that the definition that was used of disruptive was too broad, because it really does not reach the area of threatening behavior, you know, because the state really didn't prove that he was at that time dangerous to himself or others. And it's true, I asked actually, I should have maybe, I asked the psychiatrist, is he currently dangerous? And if he was currently threatening the person, I thought the doctor said yes. But she said he's potentially dangerous. Well, just to medicate someone, because in the future you could be dangerous or in the past actions you have to look at his current behavior. And at that time he was stable in the last two weeks, and even, and also there was no incidents in February. So we're looking at the March incident where we would argue that's more of the nature of disruptive behavior than threatening behavior. So you don't give any credence to the allegation that he had a deterioration of his ability to function apart from the showering, which, you know, you don't think is a problem, basically. You know, I read his testimony, and it was just totally inappropriate. Yeah, and it was part of my problem, too, and I know he was developmentally disabled, so I didn't want to present that to the judge, and I should have. So, but he did have some words out there, but you're allowed to have it. Total words. Yeah. But you're allowed to have delusional, incoherent thoughts. That's what I'm kind of asking you. Yeah. So, and, I mean, the thing is, is they affirmed on the issue of deterioration of ability to function when, let's say, and I've had cases where they refuse to eat or you're not treating a physical medical thing that your livelihood or yourself is endangered by not taking showers, it's more of an issue, it's an inconvenience to hospital staff, but they got him to shower at least weekly. You know, not that I'm proponing of it, but I don't think that's sufficient on the deterioration of ability to function. The more sticky thing is on the threatening behavior, but if you think about it, what they relied on is his past activity, his future activity, potentially dangerous, not his current actions, and even if you consider that action in March, that was more of a disruptive nature. I don't think it wasn't the one to force an employee. I think the employee happened to be a psychiatrist or therapist. Yeah. And she did feel threatened. Well, he tapped her on the, oh, I'm sorry, I don't mean to go over it. No, go ahead. She asked him to stop and he continued and she didn't think it was threatening? Well, he tapped her on the shoulder to get her attention. Uh-huh. So it wasn't like, I don't know intentionally on that, but it's not a level of threatening behavior, a clear and convincing evidence of threatening behavior, Your Honor. Okay, thank you. Okay. Thank you. Good afternoon, Your Honor. Please place the court, counsel. Before jumping into the argument, I just wanted to give a brief word on jurisdiction. We discussed movements here. Obviously, this case is moved. The pardoning staff, I think, agree that the movements doctrine, there's an exception that would apply here. I would submit that. Capable repetition is probably factually applicable. This is an individual who has been hospitalized repeatedly, has had several prior instances of unfitness findings in criminal proceedings. He has a history of psychiatric schizophrenia dating back close to 40 years, 35 years. So certainly I think this would fit the capable repetition exception. Right. So you're conceding that this case is not? I would concede that this court has jurisdiction, yeah. But because this court has an independent jury to determine, I just wanted to bring that up quickly. Okay. Thank you, Your Honor. So I'm going to start here with the threatening behavior. And in listening to the argument, and sort of consistent with the argument raised in the written argument as well, there's a little bit of sort of shift in the terminology, which is sort of important, because we have a statutory scheme which allows for the involuntary administration of a psychotropic medication. And, of course, there's a list by statute of the conditions that have to be satisfied for that. One of them is that there has to be exhibition and run of the following conditions, deterioration or suffering or threatening behavior. And what's sort of happened here is we've transmogrified threatening behavior into dangerous behavior, and that's changed into currently threatening or past threatening, excuse me, past dangerous and current dangerousness. But the word dangerousness does not appear in the statute. It's threatening behavior. I found it interesting when I made a note of this in the argument that counsel indicated that there was no indication that the respondent was dangerous to himself or others, which is sort of indicative of the problem here, because that's language applicable to the involuntary commitment. And that's a different statutory scheme. It's a different statutory language framework than what we have here for the involuntary administration of psychotropic medications. And so I want to emphasize at the outset that it's important that we have, you know, we define the terms in which the testimony is presented in the same sense of what the statute itself contemplates as part of a factual prerequisite. It seems, though, that in this petition that there was a lot of reliance or reference at least to past conduct and that there was a very narrow period of time between the conduct or the testimony of the conduct and what was in the petition. Correct. Well, the outlines I sort of set out, I think that she testified to, began somewhere around November of the preceding year. No, but they already had a petition on that. I understand that. But these things don't currently have been adapted because there was a continuing course of threatening behavior that led on up to about 10 or 12 days prior to the petition being filed. And it was not an isolated incidence, but it was a repetition of behavior that I think could be fairly objectively characterized as threatening behavior. Do you think this statute is a repetition statute or is it really designed to take care of the immediacy, if you will? If that restricted them, its purpose, I think, would be probably undermined because I think that in the psychiatric field, I'm not a psychiatrist, so pardon my argument in this regard. I'm sorry. But I think that what you have is a situation where when a court is going to be asked to take into consideration the totality of the circumstances and take into consideration what this individual is exhibiting, the fact that there's a repetition, it's required a short petition. I think the repetition probably underscores the strength of the evidence rather than undermines the validity of the order. I guess my point is these are only 90-day orders. Yeah. So it seems to me that just because the statute says they're short in duration, you can't or can you kind of bootstrap continuing education by continuing administration of medication? Right. Can you bootstrap that by using all this past conduct and then saying, oh, well, he tapped somebody's shoulder or whatever? Well, for instance, where the court was simply being asked to consider evidence that was remote. Not remote, but already been used. Well, but it's part of a continuing course of conduct, which is not abating. Maybe that's the best way to characterize it. We have a situation where the respondent's behavior, to put it this way, we have exhibition of prior behaviors sort of as such kind of the ongoing nature of it, which continues on through the past into the period right preceding the filing of the petition in this case. Excuse me. Yes. The actual statute says that. It says under 4, it says the court may consider evidence that talks about serious violence. It says repeated past patterns of specific behavior and actions related to the person's illness. Okay. So, I mean, isn't that part and parcel of what we're supposed to consider? No, I think even having the statute in front of you, it's sort of intuitive as well. Yeah. I mean, these facts don't occur in a vacuum. You know, psychosis doesn't just sort of spontaneously erupt at a point just before a petition is filed. Now, granted, again, you know, I think that the strength of the evidence is undermined when there's a lack or paucity of evidence showing, you know, recency of behavior, which can be constituted or characterized as threatening. But I do think that when you are recent threatening behavior coupled with past threatening behavior, shows a psychiatric condition which is a more immediate need of psychotropic medication administration than one where it appears that that psychosis has abated for whatever reason. Well, what about the most recent episode? It's been characterized as that. Right. There's really two instances in March 2nd, which is the most recent episode that she testifies to. One was where he attempted to touch Dr. Kim Amsbrough herself. She asked him not to make physical contact. He tapped her again. Then he began to yell and pound on the documentation station window. Then, while still yelling, he pulled down his pants and exposed his buttocks, which required, because of his agitated state, to be administered emergency medication. That's not the only thing that happened on March 2nd. Then she testified that he then threatened to kill another patient if he keeps pooping on the floor. That was on March 2nd. That was also on March 2nd, according to her testimony, right? And that I'm going to kill someone usually dovetails with some sort of bathroom or bathroom-related activity appears to be sort of a common theme of his psychosis, which I think is demonstrated amply in the testimony as well at the hearing. So, yeah, I mean, when you look at this fact, he does have these connotations of kill, harm, murder. There is one instance where he actually physically battered an individual. I mean, I think when you look at the instances of threatening behavior in the collective, there's more than ample evidence for the trial court here to find that that's statutory. Yes, ma'am? Could you address the argument that the doctor did not testify to the side effects of the one particular lens? Well, to pair it as well, that's a trickier issue. Okay. This is, here's kind of what happened here. Okay, now the statute requires that the drugs that are to be administered, along with the alternative medications, they're to be individually identified, and their benefits and side effects and negatives are to be identified. The testimony cannot be done in the collective, like, these are all drugs in here that they are. There has to be some particular discussion of the drugs individually, and I understand this could be an issue. The state's position is this. We have an instance here where the doctor didn't provide, you know, detailed testimony about, it was in the petition as well, about the drugs that were to be administered. She had gone through each of the drugs individually. Then there was, she had begun to provide testimony regarding the side effects and the negative side effects of the medication. There was an interruption in the proceedings. She then got back into the stand, and we had kind of side railed a little bit, and commented about, I think the language was, typical anti-psychotic, cyclorazepine, risperidone, aripiprazole, and these were, you know, classes of the drugs that she had sort of initially referenced, but she did not discuss specifically the olanzapine. Our position is it's sort of distinguishable from the cases where, you know, it's not sufficient to talk about some but not all the drugs, because what we have here is an instance where, having identified these drugs at the outset with regards to it, she came back, I think that she was attempting to, without any kind of intervention by anyone else to sort of correct it, I suppose, to classify the drugs like olanzapine, the risperidone, the aripiprazole, as classifications of anti-psychotics that have these commonality side effects. You know, I cite to the National Institute of Health website, which shows that these classes of drugs fall in the same exact classroom, they're called atypical anti-psychotics. But you're not saying that that's adequate to just classify, put them all in the same bucket? I think that I cite that largely to give reference to the eye doctor's testimony, when she makes reference to, you know, typical anti-psychotics, I think it was, where she was attempting to sort of lump in the drugs she had already identified as anti-psychotics and explaining the benefits that the drugs would provide. If this Court finds that that's inadequate, you know, the testimony is what it is, and I understand that it is sad to hear she was about to kind of do individual drugs before there was a sidebar and it kind of set the testimony off track. My position is that this is, if I may finish, Your Honor, that this is adequate to satisfy the statutory prerequisite for the Court to be assured of the benefits and the negatives that are attached to these administration of these psychotropic medications. On that issue, I just want to follow up. Yes, ma'am. I know, Mr. Daley, that you and your opponent are excellent attorneys, and so I'm wondering if you've read the November case just published by this Court of In re Christopher C. I have not, Your Honor. Okay. This issue of psychotropic medication was raised in that case. I just happen to be a good panel member, and I dissented in that case. And I'm just wondering, I would like to hear from both parties, Chief Justice, on that issue in light of our most recent publication of this order. It was published at the request of one of the parties. Yes. And since there's not a unanimous opinion on this case in our own district. I will open it up to you, Your Honor. If you wouldn't mind, I would like the parties to hear. No. If there's a discussion on it, they can both be given equal time, in my view. This is in reference to which issue, Your Honor? What it takes to administer the psychotropic medication. What kind of? You're talking about administering it? The sufficiency of the evidence. Sufficiency of the evidence. Of the medication itself. Okay. What, 21 days? That's not with me. That would be fine. I'm not real clear on what you're. It would be limited to what evidence is necessary to comply with section 2-107.1. Do you, Your Honor, wish to do this in sort of a briefing format, i.e. appellant go first? No. And we respond, or just individual? I don't care. Responsible in 21 days. That would be fine. I don't care. I really want to do it. I just don't, Your Honor, want to give a chance for them to rebut what I argue. Well, no. Since they have heard of you. What's your pleasure? I'm not saying that either party is right or wrong. What I'm saying is that this case was published November 3rd. Sure. I know I dissented in this case. I was just reviewing it as you were talking because of all of this. And the issue was the safe and effective administration of the medication under 405 ILCS 5-2-107.1. And I think we're talking about that again here. And neither party has had the opportunity to look at this case and even see if it applies. So I'm just asking so that we don't become unaware of a case in our own district, that we let both parties at least review the case. If they want to respond, I don't have a problem if they both do at the same time. What do you think? That's fine. Do you need to citate? It's on our website. It was published November. Where was it? You can see it. I found it easily on our website. It's up to you. How about you want 19 days or do you want... I'll file a bill. Okay, there we go. How about before the 25th? Before the 25th. We need a court order that issues that says... How about the... Before the 23rd? Can I say the 25th? 25th is... No, no, 25th is a Tuesday. Okay. How about you want it on the 21st? 21st is Friday. Okay. If that's... Yeah, it's our district. It makes no difference to me. We'll go by December 21st. Okay. Thank you. Just to clarify a couple points. I relied on the issue of dangerous to self and others because under the U.S. Supreme Court, due process requires that in voluntary medication order, proof must be made that the party is dangerous to self or others and that treatment is in the party's medical interest. That's on page 15 of my brief, Washington v. Harper. So you're saying that it has to be a danger to you? There has to be a dangerous element to it. That would lie in the face of the requirement that it can be for suffering? Or I guess a deterioration of their ability to function? Or the treatment is in the person's best medical interest. So suffering could be intensive suffering, so that could deteriorate their mental health. So deterioration of ability to function would be affecting their physical health because they're not eating or not sleeping. So you're saying that would be... So the criteria has to be dangerous to themselves or others. And or affecting their health. And or affecting their health. Yeah. I forgot the or if it was for. Okay. Sorry. I try to narrow it, but I won't. And then the other issue is how I got the issue of the current behavior is under 4B of the statute. It says that because of sentimental illness or developmental disability, the recipient currently exhibits any one of the following. So the legislature put that element of currently exhibiting that element. And then with regard to the issue of the medication,  I believe that orazapine has the same side effects as the other atypical antipsychotic medications. It may be and may not, but we're not in a position to take that or assume that that's true. You know, just that part of evidence wasn't presented. So. Any further questions? Did you understand the name of the case? I was actually the other side. And the next case I'm arguing will address that more. Okay. Thank you. I will forward it to counsel. Okay. Thank you. All right. Thank you, counsel. The court will take this matter under advisement under decision in due course.